## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

2019 MAY 23  P 3: 01

MATT M DISPENSA
Plaintiff.

Case No. _____

vs.

NATIONAL CONFERENCE OF CATHOLIC BISHOPS,
CORPORATION SOLE,
DANIEL NICHOLAS DINARDO,
ARCHDIOCESE OF BOSTON,
CORPORATION SOLE,
CARDINAL SEÁN P. O'MALLEY
REV JON C. MARTIN
DOES ONE THROUGH ONE HUNDRED DEFENDANTS.
Defendants.

### COMPLAINT WITH JURY DEMAND FOR
### RACKETEERING, PERSONAL INJURIES,
### NEGLIGENCE AND FRAUD

### PARTIES

1.  Plaintiff Matt M Dispensa Sr. of 59 Sousa Blvd in Hudson NH, is an adult man who was

    a minor at the time of the abuse, alleged herein, occurring between 1975 through 1980.

2.  Defendant National Conference of Catholic Bishops (hereafter NCCB.), a corporation

    sole, is a non-profit religious organization with its principal place of business at 3211 4th

    Street, NE Washington, DC 20017-1194

3.  Defendant Cardinal Daniel Nicholas Dinardo, with a principle place of business

    Archdiocese of Galveston-Houston, 1700 San Jacinto, Houston TX 77002 , is the

    President of the National Conference of Catholic Bishops and by virtue of his office,

    Defendant Dinardo is empowered to, and in fact represents the Defendant NCCB in

litigation. Defendant Dinardo is sued individually and in his capacity as the President of the NCCB.

4. Defendant Archdiocese of Boston, a corporation sole, is a non-profit religious organization with its principal place of business in 66 Brooks Drive, Braintree, MA 02184-3839 (hereafter Archdiocese.)

5. Defendant Cardinal Sean P. O'Malley, with his principal place of business in 66 Brooks Drive, Braintree, MA 02184-3839 (hereafter O'Malley). O'Malley is the Cardinal of Defendant Archdiocese and by virtue of his office, Defendant O'Malley is empowered to, and in fact, represents the Defendant Archdiocese in this litigation. Defendant O'Malley is sued individually and in his capacity as Cardinal of the Archdiocese.

6. Defendant Rev. Jon C Martin (hereafter Priest.), of 57 Dam Site Road, Barnstead, NH 03225, was ordained a Roman Catholic Priest in 1965. At all times material, Defendant Priest was under the direct supervision, employ and control of Defendant Archdiocese.

7. Defendant Does 1 through 100 are unknown agents and/or coconspirators whose identities will be provided when they become known.

8. Each Defendant herein is the agent of the other and each Defendant is a coconspirator with the other relating to the acts alleged herein

## JURISDICTION AND VENUE:

9. The UNITED STATES DISTRICT COURTS have jurisdiction over disputes among residents of different states with an amount in controversy exceeding $75,000. The Parties to above complaint reside in four different states of NH, MA, TX, DC and the amount in controversy is greater $75,000.

2

## FACTUAL BACKGROUND-RACKETEERING INFLUENCED AND CORRUPT ORGANIZATION ACT, CONSPIRACY AND FRAUD COUNTS

10. Defendant Priest, Defendant O'Malley, Defendant Archdiocese, Defendant Dinardo and Defendant NCCB are each person's under 18 U.S.C. § 1961(3).

### ENTERPRISE

11. The relationship between Defendant Priest, Defendant O'Malley, and Defendant Archdiocese (hereafter the Enterprise I.) constitutes an association in fact enterprise under 18 U.S.C. § 1961 (4) and the persons controlling or directing the affairs of Enterprise I have engaged in activities or a pattern or practice of conspiracy and racketeering activity in violation of 18U.S.C. § 1962 et seq.

12. Alternatively, the relationship between the NCCB (hereafter the Enterprise II.) constitutes an association in fact enterprise under 18 U.S.C. § 1961(4) and the persons controlling or directing the affairs of Enterprise II have engaged in activities or pattern or practice of conspiracy and racketeering activity in violation of 18 U.S.C. § 1962 et seq.

13. Alternatively, the relationship between Defendant O'Malley and Defendant Archdiocese (hereafter the Enterprise III.) constitutes an association in fact enterprise under 18 U.S.C. § 1961(4) and the persons controlling or directing the affairs of Enterprise III have engaged in activities or a pattern or practice of conspiracy and racketeering activity in violation of 18 U.S.C. § 1962 et seq.

14. Enterprises I, II, and/or III had an ongoing business aside and apart from the three racketeering acts alleged herein in that they were involved in the operation of the Roman Catholic Church in the United States.

15. The Defendants maintained and exercised control over the enterprises alleged.

## ACTIVITY

16.  Since approximately 1960 through to the present, persons controlling or directing the affairs of Enterprise I, II, and/or III engaged in or joined in a conspiracy to intentionally, recklessly and/or negligently conceal criminal conduct of its agents, aid and abet the concealment of criminal conduct, aid and abet criminal sexual conduct, fail to report criminal conduct of its agents, obstruct justice, obstruct criminal investigation, obstruct state and/or local law enforcement, evade criminal and/or civil prosecution and liability, bribe and/or pay money to victims in order to keep its criminal conduct secret, violate the civil rights of children and families, engage in mail and/or wire fraud, and commit fraud and/or fraudulent inducement of its parishioners in furtherance of its scheme to protect predatory priests and other clergy from criminal and civil prosecution, to maintain or increase charitable contributions and/or avoid public scandal in the Roman Catholic Church.

17.  The persons controlling or directing the affairs of Enterprise I, II, and/or III knew that Roman Catholic clergy were sexually abusing and exploiting children and they showed willful indifference and/or a reckless or intentional disregard for the children in order to further their scheme.

18.  In 1985, Defendant National Conference of Catholic Bishops received a report titled "The Problem of Sexual Molestations by Roman Catholic Clergy." This report described the continuing and growing problem of child sexual abuse by priests within the Roman Catholic\Church. According to the report, if the Roman Catholic Church failed to embrace the problem of its predatory priests and clergy, the church could face liability in excess of $1,000,000,000.00 over ten years. In addition, the report outlined steps that the

Roman Catholic Church, through the National Conference of Catholic Bishops, must take

to protect the church and parishioners from the devastating effects of molesting priests. In

response, the National Conference of Bishops ignored the report and recommendations

and, instead, continued providing a fertile environment for molesting priests. Upon

information and belief, Enterprise I, II, and/or III engaged in the racketeering activity

described above in order to protect financial interest in addition to protecting predatory

priests and other clergy from criminal prosecution and the other aspects of the scheme

described above.

19.  In the same report described above, the reporter cautioned Defendant National

Conference of Catholic Bishops to resist the practice by some to sanitize or purge the

secret files of potentially dangerous material. In addition, the reporter warned Defendant

National Conference of Catholic Bishops that their practice of moving files containing

potentially dangerous material to the Apostolic Delegate (delegate to the Vatican), where

the files would be immune from subpoena, could ultimately destroy the immunity

enjoyed by the Holy See. These warnings were not heeded.

20.  In furtherance of its scheme and enterprise to protect molesting priests and other

clergy from criminal prosecution and civil liability, maintain or increase charitable

contributions and/or avoid public scandal in the Roman Catholic Church, persons

controlling or directing the affairs of Enterprises I, II and/or III, intentionally and

fraudulently engaged in the routine practice of maintaining secret "sub secreto" archival

files of sexual misconduct by priests. These sub secreto files are accessible to the Bishops

only. The existence of these secret files and the contents were not disclosed to or made

available to law enforcement authorities, or others, in order for law enforcement to

investigate the known crimes of the priests. In fact, it is the practice of the Roman

Catholic Church to fraudulently purge the files and hide them from persons, including

law enforcement authorities, seeking access to them.

21. As evidence of this fraudulent practice and its widespread use, in 1990, in an

address by Bishop A. James Quinn to Defendant National Conference of Catholic

Bishops titled "NCCB Guidelines, and other Considerations in Pedophilia Cases," Bishop

Quinn stated:

> Nevertheless, personnel files should be carefully examined to
> determine their content. Unsigned letters alleging misconduct
> should be expunged. Standard personnel files should contain no
> documentation relating to possible criminal behavior. Serious
> moral questions, signed allegations, those should be a part of the
> secret file anyhow. But they still subpoena them. But comb
> through your files.

> Now what files have been subpoenaed, they cannot be tampered
> with; destroyed, removed; that constitutes obstruction of justice
> and contempt of court. Prior, however, thought and study ought to
> be given if you think it's going to be necessary; if there's something
> there you really don't want people to see you might send it off to
> the Apostolic Delegate, because they have immunity to protect
> something that is potentially dangerous, or that you consider to be
> dangerous, you might send it there.

The Apostolic Delegate is the delegate from the Vatican and Holy See who the church

believes enjoys sovereign immunity from lawsuits and subpoenas.

22. In furtherance of its scheme, persons controlling or directing the affairs of

Enterprises I, II, and/or III have routinely entered into secret settlement agreements with

confidentiality provisions that required victims of sexual abuse to preserve the Bishop's

secrets from scrutiny by the public and law enforcement authorities.

23. In furtherance of the scheme, persons controlling or directing the affairs of

Enterprises I, II, and/or III, illegally bribed victims of sexual exploitation and abuse in order to influence them to not report the sexual exploitation and abuse to law enforcement authorities and ultimately to influence the victims to not testify, in court, against members of Enterprise I, II, and/or III. As an example, Anthony J. O'Connell, former Bishop of the Diocese of Knoxville and former Bishop of the Diocese of Palm Beach made cash payments to victims he had sexually abused in order to keep them from reporting Bishop O'Connell's criminal activity and to ultimately influence the victims to not testify against him or other coconspirators in Court. These cash payments began after Bishop O'Connell's abuse of a child seminarian was reported to Bishop Raymond Boland, Bishop of the Diocese of Kansas City-St. Joseph.

24. As a result of the acts of persons controlling or directing the affairs of Enterprise I, II and/or III, intentionally, showing willful indifference and/or with reckless disregard, maintained a web of predatory priests who perpetrated criminal acts of child sexual abuse throughout the United States and the world over at least a forty (40) year period of time. Persons controlling or directing the affairs of Enterprise I, II and/or III maintained this web by making fraudulent representations, concealing criminal activity, obstructing justice and criminal investigations, evading civil and/or criminal liability, bribing and/or payment of money to victims in order to keep its criminal conduct secret, violating civil rights of children and families, and committing mail and wire fraud. Evidence that persons controlling or directing the affairs of Enterprise I, II and/or III committed a continuing pattern of racketeering activity in furtherance of its scheme by engaging in fraudulent conduct across the nation, includes, but is not limited to, the following examples:

a. Fr. Thomas Adamson

Father Thomas Adamson (hereinafter "Fr. Adamson"), was an ordained Roman

Catholic priest employed by the Catholic Bishop for the Diocese of Winona in

Minnesota. From 1958 through December 1974, Fr. Adamson was employed by Winona

Diocese at various times as a teacher and principal at Diocesan parochial schools and as a

parish priest at Diocesan churches across southern Minnesota. Throughout this period, Fr.

Adamson engaged in and/or attempted to engage in sexual contact with at least eleven

minor boys. Each of these minor boys were students and/or parishioners of the local

Diocesan schools and parishes. In 1964, the Bishop of the Winona Diocese learned that

Fr. Adamson sexually abused a boy or boys in Caledonia, Minnesota. On discovery of

this abuse, the Bishop deceitfully transferred Fr. Adamson to a new parish and took no

further steps to investigate the misconduct or prevent further sexual abuse by Adamson.

In approximately 1967, the Bishop of the Winona Diocese learned that Fr. Adamson had

sexually abused a boy or boys who were students at Rochester Lourdes High School. On

discovery of this abuse, the Bishop placed Fr. Adamson in counseling for a short time

and then deceitfully transferred him to a new parish without taking further steps to

investigate the misconduct or prevent future abuse. In approximately December 1973,

and again in April 1974, the Bishop of the Winona Diocese learned that Fr. Adamson had

sexually abused more boys in the Rochester, Minnesota area. On discovery of this abuse,

the Bishop placed Fr. Adamson in therapy for approximately three months, after which

time he was deceitfully returned to his pastoral duties in Rochester without taking further

steps to investigate the misconduct or prevent future abuse. In December 1974, the

Bishop of the Winona Diocese discovered that Fr. Adamson had sexually abused minor

boys in Adrian, Minnesota in 1961-62. In response to threats from the families of these

victims to publicly expose Fr. Adamson's history of sexual abuse, the Bishop of the

Winona Diocese, acting in furtherance of the scheme described above and acting in

concert with the Archbishop for the Archdiocese of St. Paul and Minneapolis, transferred

Adamson to the Archdiocese of St. Paul and Minneapolis in Minnesota without taking

reasonable steps to prevent future abuse. Beginning in January 1975, Father Adamson

was employed by and assigned to the Archbishop of the Archdiocese of St. Paul and

Minneapolis as a parish priest in various parishes across the Archdiocese. During this

time period, Adamson sexually abused numerous minor boys who were parishioners at

the local churches where Adamson was serving as a parish priest. In November 1980, Fr.

Adamson admitted that he had sexually abused another young boy, who was a

parishioner at Immaculate Conception in Columbia Heights, Minnesota. This sexual

abuse was reported to the Archbishop of the Archdiocese of St. Paul and Minneapolis by

the father of the abused child, who also threatened to bring criminal charges against Fr.

Adamson. In order to protect Fr. Adamson from criminal prosecution, to maintain or

increase charitable contributions, and to avoid public scandal, the Archbishop of the

Archdiocese of St. Paul and Minneapolis fraudulently represented to the father of the boy

that the sexual abuse of his son was an "isolated occurrence." In addition, the

Archdiocese of St. Paul and Minneapolis fraudulently represented to the boy's parents

that Fr. Adamson would be placed in treatment and the family would be advised of

Adamson's whereabouts. Based upon these fraudulent assurances by their church

officials, the family did not report Adamson to the law enforcement authorities for

criminal prosecution. Upon information and belief, the Bishop of the Winona Diocese

and the Archbishop of the Archdiocese of St. Paul and Minneapolis used the U.S. Postal Service and interstate wire service to perform the fraudulent acts described above.

b. Fr. James Porter

Fr. Porter served in parishes in the Fall River Diocese in Massachusetts from 1960 through 1967. During that time, the Bishop of the Fall River Diocese repeatedly learned that Father Porter sexually molested parish youth. In response, the Bishop of Fall River deceitfully transferred Father Porter to new parishes and instructed him to undergo psychotherapy. From 1960 - 1963, Fr. Porter worked in St. Mary's Parish in North Attleboro, Massachusetts. During that period, Fr. Porter sexually molested over 40 parish children. When the Bishop for the Fall River Diocese learned of the abuse, the Bishop deceitfully transferred Fr. Porter to Sacred Heart Parish in Fall River, Massachusetts. In 1963, while Fr. Porter was at the Sacred Heart Parish, a parent confronted the Bishop of the Diocese of Fall River regarding Fr. Porter's new parish assignment. In response, the Bishop of the Diocese of Fall River fraudulently represented to the parent that they would take the parent's concern seriously and that Fr. Porter posed no risk. From 1963-1965 while Fr. Porter was still at Sacred Heart Parish, Fall River, Massachusetts, Fr. Porter molested two parish youths. As a result, the Bishop of the Diocese of Fall River deceitfully transferred Fr. Porter to St. James Parish in New Bedford, Massachusetts. In 1967 while Fr. Porter was at St. James Parish, New Bedford, Massachusetts, Fr. Porter molested approximately 22 more children in the New Bedford area. In 1967, acting in furtherance of the scheme described above and acting in concert with the Archbishop of the Archdiocese of Santa Fe, the Bishop of the Fall River Diocese and the Order of the Servants of the Paracletes transferred Fr. Porter from the Fall River

Diocese to the Archdiocese of Santé Fe, New Mexico in order to allow Fr. Porter to enter the sexual abuse treatment program operated at the Servants of the Paracletes facility in New Mexico for residence and treatment relating to his pedophilia.

In October 1968, the Archbishop of the Archdiocese of Santa Fe, Bishop for the Diocese of Fall River and the Servants of the Paracletes allowed Fr. Porter to serve in parishes. In February 1969, the Archbishop of the Archdiocese of Santa Fe learned that Fr. Porter had sexually molested seven (7) parish youth while released from the sexual abuse treatment program. In June 1969, acting in furtherance of the scheme described above and acting in concert with the Bishop of the Crookston Diocese, the Archbishop of the Archdiocese of Santa Fe, the Servants of Paracletes transferred Fr. Porter from the Archdiocese of Santa Fe to the Crookston Diocese in Bemidji, Minnesota where Fr. Porter provided weekend service at the St. Philip's parish in Bemidji, Minnesota. While in Bemidji, Fr. Porter sexually molested twenty-two (22) more children. In September 1970, Father Porter's sexual abuse of parish boys at St. Philip's was discovered by the Bishop of the Crookston Diocese and he was removed from the St. Philip's parish. At that time, Fr. Porter was transferred to residence with the Servants of the Paraclete at the St. Michael's Institute in Missouri. Upon information and belief, the Bishop of the Fall River Diocese, the Archbishop of the Archdiocese of Santa Fe, the Bishop of the Crookston Diocese and the Servants of the Paracletes used the

U.S. Postal Service and interstate wire service to perform the fraudulent acts described above.

c. Fr. John Geoghan

In 1962, Fr. Geoghan molested four (4) boys from the same family in the Blessed

Sacrament parish in Saugus, Massachusetts. While there, another priest contacted the Archbishop of the Archdiocese of Boston to report that Fr. Geoghan frequently took boys to his rectory bedroom. That same priest also reported that church officials threatened to reassign him as a missionary in South America for reporting Geoghan.

In 1966, the Archbishop of the Archdiocese of Boston deceitfully assigned Fr. Geoghan to St. Bernards parish in Concord, Massachusetts. Although there are no identified victims from St. Bernards, Fr. Geoghan was abruptly transferred by the Archbishop to another parish after only seven months of service.

From 1967 through 1974, the Archbishop of the Archdiocese of Boston deceitfully assigned Fr. Geoghan to the St. Paul parish in Hingham, Massachusetts. While there, Fr. Geoghan sexually molested numerous boys. In 1968, Fr. Geoghan was sent by the Archbishop of the Archdiocese of Boston to the Seton Institute in Baltimore, Maryland for treatment relating to Fr. Geoghan's sexual abuse of several parish children.

From June 1974 through February 1980, the Archbishop of the Archdiocese of Boston assigned Fr. Geoghan to St. Andrew parish in Jamaica Plain, Massachusetts. There, Fr. Geoghan sexually abused many other children including seven brothers in the Dussourd family. In 1982, the boy's aunt, Margaret Gallant, reported the sexual abuse to then Cardinal Medeiros. In the letter Ms. Gallant confirms the practice of concealment and secrecy when she wrote:

> It was suggested that we keep silent to protect the boys. That is
> absurd since minors are protected under law, and I do not wish to
> hear that remark again, since it is insulting to our intelligence.

Despite knowing of Fr. Geoghan's propensity for child sexual abuse, the Bishop of the

Archdiocese continued to assign Fr. Geoghan to parishes where he ultimately sexually abused at least one hundred and thirty (130) children. Upon information and or belief, the Bishop of the Archdiocese of Boston used the U.S. Postal Service and interstate wire service to fraudulently conceal Fr. Geoghan's acts of sexual abuse. During Fr. Geoghan's predatory spree, the following people had supervisory responsibility for Fr. Geoghan: Cardinal Humberto Medeiros (Archdiocese of Boston), Cardinal Bernard Law (Archdiocese of Boston), Bishop Thomas V. Daily (Diocese of Brooklyn, New York), Bishop Robert J. Banks (Diocese of Green Bay), Bishop William F. Murphy (Diocese of Rockville Centre, New York), Bishop John B. McCormack (Diocese of Manchester, New Hampshire) and Archbishop Alfred C. Hughes (Archdiocese of New Orleans). Each of these Bishops participated in the scheme and enterprise to protect molesting priests and other clergy from criminal prosecution, maintain or increase charitable contributions and/or to avoid public scandal in the Roman Catholic Church by concealing the acts of sexual abuse by Fr. Geoghan.

d. This scheme described above can also be evidenced in other well-known cases involving former priests Gilbert Gauthe in Louisiana, Robert Ray Peebles in Dallas, Texas, Rudolph Kos also in Dallas, Texas, Paul R. Shanley in Boston, Massachusetts, David A. Holley in Worchester, Massachusetts/New Mexico/Texas and youth minister Christopher Reardon of Middleton, Massachusetts.

25. Upon information and belief, persons controlling or directing the affairs of Enterprises I, II, and/or III fraudulently misrepresented the facts of known sexual misconduct to prospective seminarians and their families for the economic purpose of maintaining or increasing the charitable contributions and tuition payments of

parishioners, seminarians and prospective seminarians. Upon information and belief, much, if not all, of the solicitations for contributions were effectuated by using the United States Postal Service or interstate wire service.

26. Upon information and belief, each of the persons controlling or directing the affairs of Enterprises I, II, and/or III conspired with each other, the above-named priest perpetrators and others in the Roman Catholic Church in the conduct of a pattern of racketeering activity described above to acquire or maintain an interest in or control of an enterprise which affects interstate trade and commerce by using the United States Postal Service, e-mail and/or the telephone in violation of 18 U.S.C. § 1962(d) and other Massachusetts's laws.

27. Defendant's fraudulent acts affected interstate commerce by affecting charitable contributions and tuition payments of parishioners across the nation.

28. As a result of the scheme and racketeering activity of persons controlling or directing the affairs of Enterprises, I, II, and/or III, thousands of children, including Plaintiffs, were subjected to sexual abuse and exploitation by Roman Catholic clergy through a pattern of racketeering activity over a period of at least three decades.

29. As a result of the illegal acts of the persons controlling or directing the affairs of Enterprise I, II, and/or III, Plaintiff and many others suffered damage in the loss of earning capacity in his present business endeavor and the right to pursue monetary compensation for his injuries.

30. Upon information and belief, the persons controlling or directing the affairs of Enterprises I, II and/or III engaged in a continuing pattern and practice of the illegal

activities as set forth herein throughout various jurisdictions in the United States and the world.

## BACKGROUND FACTS APPLICABLE TO ALL COUNTS
### Matt M Dispensa

31.  Plaintiff Matt M Dispensa was raised in a devoutly Roman Catholic family, was baptized, confirmed, attended catholic schools, regularly celebrated weekly mass and received the sacraments through the Roman Catholic Church.

32. Plaintiff Matt M Dispensa's family home was directly across the street from St. Roberts Bellarmine Church at 203 Haggetts Pond Road in Andover, MA.

33. Plaintiff Matt M Dispensa and his family attended Church at St. Roberts Bellarmine Church in Andover, Massachusetts.

34. Plaintiff Matt M Dispensa's family were founding members of St. Roberts Bellarmine Church and parish.

35. Plaintiff Matt M Dispensa's mother, Gail Dispensa, co-founded St. Robert's Country Day school located at St Roberts Bellarmine Church.

36. Plaintiff Matt M Dispensa attended St. Robert's Country Day School at St. Roberts Bellarmine Church.

37. Plaintiff Matt M Dispensa was a member of St. Roberts Bellarmine youth group.

38. Plaintiff Matt M Dispensa was a member of St Robert Bellarmine Boy Scout Troop 79.

39. Defendant Priest was an Associate Pastor at St. Robert's Bellarmine Church from June of 1973 to May of 1981.

40.  Plaintiff Matt M Dispensa was an altar boy and his family was heavily involved in church activities at the St. Roberts Bellarmine Church.

41. From approximately 1975 through 1980, Defendant Priest sexually abused and exploited Plaintiff Matt M Dispensa. After Defendant Priest sexually abused Plaintiff Matt M Dispensa, Defendant Priest warned Plaintiff Matt M Dispensa to not tell anyone about the abuse.

42. The Defendant Priest sexually abused Plaintiff Matt M Dispensa at St. Robert Bellarmine Church and St. Roberts Bellarmine rectory both located at 198 Haggetts Pond Road in Andover, MA.

43. Plaintiff Matt M Dispensa reported the history of sexual abuse to his parents in April of 1981. Plaintiff's parents Martin Dispensa and Gail Dispensa reported the sexual abuse to Father Paul T. Keyes, a close friend and former priest at St. Robert's Bellarmine Church. At Father Keyes instruction the sexual abuse was reported to Cardinal Humberto Sousa Medeiros the Archbishop of Boston.

44. Plaintiff Matt M Dispensa and his parents were interviewed by two representatives of Defendant Archdiocese. The Defendant Archdiocese fraudulently represented to the Plaintiff's parents the sexual abuse of their son was an "isolated occurrence." In addition, the Archdiocese fraudulently represented to the Plaintiffs parents that Fr. Martin would be placed in treatment and the family would be advised of Martin's whereabouts. Based upon these fraudulent assurances by their church officials, the family did not report Defendant Martin to the law enforcement authorities for criminal prosecution.

45. Defendant Priest was removed from St. Robert's Bellarmine church in May of 1981.

46. Plaintiff position as a minor, together with Defendant Priest's position in the Roman Catholic Church as a Pastor, holy man and authority figure Defendant Priest was able to continue to have control and influence over Plaintiff. By his words and actions,

Defendant Priest represented to Plaintiff that his relationship with Plaintiff was God's plan and he was responsible to provide counseling, education, comfort and advice to altar boys. This representation was false and was intended by Defendant Priest to deceive Plaintiff, to gain Plaintiff trust and confidence and to obtain control over him. Plaintiff believed Defendant Priest to be a holy man, God's representative on earth, person of Christ and justifiably gave him unconditional trust and faithful obedience. By his words and actions, Defendant Priest assured Plaintiff that Defendant Priest's conduct was proper and God's will. Defendant Priest actively concealed the wrongfulness of his exploitation and misconduct involving Plaintiff. Upon information and belief, Defendant Priest fraudulently failed to report his sexual exploitation and misconduct involving Plaintiff to any entity of the Roman Catholic church at the time it occurred. Defendant Priest continued concealing the wrongful conduct from Plaintiff, the Roman Catholic Church and law enforcement authorities and successfully avoided criminal prosecution and incarceration.

47. As a result of Defendant Priest's conduct, Plaintiff was unable to discover the wrongfulness of Defendant Priest's conduct. The sexual abuse and exploitation of Plaintiff and the circumstances under which it occurred caused Plaintiff to develop various psychological coping mechanisms, including but not limited to repressed memories, which reasonably made him incapable of remembering and ascertaining the resulting damages.

48. Defendant Priest led Plaintiff to believe that Plaintiff could trust him as a benevolent and trustworthy male and spiritual advisor, and would do the right thing once information of untrustworthiness was reported. Defendant Priest's exploitation and concealment placed

Plaintiff under continuing duress in that he caused Plaintiff to believe that he was at fault

for engaging in sexual conduct with Defendant Priest.

49. Defendant Priest's conduct, as described above, misrepresented and concealed

material facts concerning his relationship with and motives in relating to Plaintiff. In

particular, Defendant Priest presented himself as a benevolent, caring spiritual advisor

whose intention was to educate Plaintiff of God's will. In fact, their relationship was one

of sexual abuse and exploitation. Defendant Priest acted with the intent to conceal the

wrongfulness of his conduct. Plaintiff relied upon Defendant Priest's own words and

conduct, without knowledge of the real facts, to his detriment. Defendant Priest's

continuing concealment of his sexual exploitation, along with Defendants negligence

and/or recklessness and Defendants failure to prevent or disclose Defendant Priest's

continuing acts of sexual abuse and exploitation, prevented Plaintiff from discovering

and/or asserting his rights.

50. The sexual abuse and exploitation of Plaintiff and the circumstances under which

it occurred caused Plaintiff to develop various psychological coping mechanisms,

included but not limited to repressed memories, made him incapable of ascertaining the

resulting damages from that conduct.

51. As a direct result of the sexual abuse and exploitation, Plaintiff suffered,

and continue to suffer great pain of mind and body, shock, emotional distress, physical

manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace,

humiliation, and loss of enjoyment of life; was prevented and will continue to be

prevented from performing his daily activities and obtaining the full enjoyment of life;

has sustained loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

52. Plaintiff in corporate all paragraphs of this Complaint as if fully set forth herein.

53. Defendants are persons under 18 U.S.C. § 1961(3).

54. The relationship described as Enterprise I, II and/or III constitutes an association-in-fact enterprise under 18 U.S.C. § 1961 (4)

55. Enterprise I, II and/or III described herein predated the sexual abuse and exploitation described above.

56. The persons described above and others associated with or employed by those persons were employed by or associated with Enterprise I, II and/or III.

57. The persons controlling or directing the affairs of Enterprise I, II and/or III engaged in activities which affected interstate or foreign commerce.

58. The persons described above aided and abetted by each other, their agents, employees and others, conducted and participated directly or indirectly in the conduct and affairs of the enterprise and/or associated themselves with the enterprise described as Enterprise I, II, and/or III through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) as described.

59. The persons controlling or directing the affairs of Enterprise I, II and/or III conspired to and did take specific acts to conceal the sexual misconduct perpetrated by Defendant Priest from 1965 through 2001. Those specific acts included racketeering and conspiracy were of an ongoing nature continuing into the future.

60. Plaintiff was injured in his business and/or property by reason, as described herein, of the above violation of 18 U.S.C. § 1962(c).

## COUNT I
## RICO--VIOLATION OF 18 U.S.C. § 1962 (c)

61. Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

62. Defendants are persons under 18 U.S.C. § 1961(3).

63. The relationship described as Enterprise I, II and/or III constitutes an association-in-fact enterprise under 18 U.S.C. § 1961 (4).

64. Enterprise I, II and/or III described herein predated the sexual abuse and exploitation described above.

65. The persons described above and others associated with or employed by those persons were employed by or associated with Enterprise I, II and/or III.

66. The persons controlling or directing the affairs of Enterprise I, II and/or III engaged in activities which affected interstate or foreign commerce.

67. The persons described above aided and abetted by each other, their agents, employees and others, conducted and participated directly or indirectly in the conduct and affairs of the enterprise and/or associated themselves with the enterprise described as Enterprise I, II, and/or III through a pattern or racketeering activity in violation of 18 U.S.C. § 1962(c) as described.

68. The persons controlling or directing the affairs of Enterprise I, II and/or III conspired to and did take specific acts to conceal the sexual misconduct perpetrated by Defendant Priest from 1965 through 2001. Those specific acts included racketeering and conspiracy were of an ongoing nature continuing into the future.

69. Plaintiffs was injured in his business and/or property by reason, as described herein, of the above violation of 18 U.S.C. § 1962(c).

## COUNT II
## RICO--VIOLATION OF 18 U.S.C. § 1962 (d)

70. Plaintiff incorporate all paragraphs of this Complaint as if fully set forth herein.

71. The persons controlling or directing the affairs of Enterprise I, II and/or III agreed to enter into a conspiracy to violate the provisions of 18 U.S.C. § 1962(c) as described above. As evidence of this agreement, the persons controlling or directing the affairs of Enterprise I, II and/or III and other co-conspirators committed the acts described herein and conspired to conceal Defendant Priest's criminal activity, or aided and abetted Defendant Priest in concealing his, criminal activity. As further evidence of the agreement, the persons controlling or directing the affairs of Enterprise I, II and/or III and other co-conspirators conspired with Defendant Priest to evade and/or aided and abetted Defendant Priest in evading criminal prosecution and the public embarrassment and liability related thereto.

## COUNT III
## SEXUAL ABUSE OF A MINOR
## IN VILOATION OF 18 U.S. CODE § 2243 (a) (2)

72. Plaintiff Matt M Dispensa incorporates all paragraphs of this Complaint as if fully set forth herein.

73. Between approximately 1975 and 1980, Defendant Priest engaged in unpermitted, harmful and offensive sexual conduct and contact upon the person of Plaintiff Matt M Dispensa in violation of 18 U.S. CODE § 2243 SEXUAL ABUSE OF A MINOR.

74. As a result of the above-described conduct, Plaintiff Matt M Dispensa has

suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

### COUNT IV
### ASSAULT
### IN VILOATION OF 18 U.S. CODE § 113 (a) (6)

75. Plaintiff Matt M Dispensa incorporates all paragraphs of this Complaint as if fully set forth herein.

76. Between Approximately 1975 and 1980, Defendant Priest engaged in unpermitted, harmful and offensive sexual contact upon the person of Plaintiff Matt M Dispensa in violation of 18 U.S. CODE § 113(a)(6).

77. As a result of the above-described conduct, Plaintiff Matt M Dispensa has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing  daily activities and obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT V
## CONSPIRICY
## VIOLATION OF 18 U.S. Code § 371

78. Plaintiff incorporate all paragraphs of this Complaint as if fully set forth herein.

79. Defendant Archdiocese of Boston acts described herein violate VIOLATION OF 18 U.S.
    Code § 371 in that Defendant Archdiocese of Boston conspired with one or more other
    person to commit acts injurious to the public health, to public morals, or to pervert or
    obstruct justice, or the due administration of the laws.

80. As a result of the above-described conduct, Plaintiff has suffered, and continues
    to suffer great pain of mind and body, shock, emotional distress, physical manifestations
    of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss
    of enjoyment of life; was prevented and will continue to be prevented from performing
    his daily activities and obtaining the full enjoyment of life; has sustained loss of earnings
    and earning capacity; and/or has incurred and will continue to incur expenses for medical
    and psychological treatment, therapy, and counseling.

## COUNT VI
## IN VIOLATION OF 18 U.S. CODE § 1001(a)

81. Plaintiff incorporate all paragraphs of this Complaint as if fully set forth herein.

82. Defendant Archdiocese of Boston and acts described herein Violation of 18 U.S.
    CODE § 1001(a), in that Archdiocese of Boston harbored, concealed and/or aided
    Defendant Priest after Defendant Priest had committed a felony, with the intent that
    Defendant Priest might avoid or escape arrest, trial, conviction and/or punishment, and
    Archdiocese of Boston having knowledge that Defendant Priest had committed a felony.

83. As a result of the above-described conduct, Plaintiff has suffered, and continues
to suffer great pain of mind and body, shock, emotional distress, physical manifestations
of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss
of enjoyment of life; was prevented and will continue to be prevented from performing
his daily activities and obtaining the full enjoyment of life; has sustained loss of earnings
and earning capacity; and/or has incurred and will continue to incur expenses for medical
and psychological treatment, therapy, and counseling.

## COUNT VII
## BREACH OF FIDUCIARY DUTY

84. Plaintiff incorporate all paragraphs of this Complaint as if fully set forth herein.

85. By holding himself out as a qualified Roman Catholic priest, religious instructor
and counselor, and by undertaking the religious instruction and spiritual and emotional
counseling of Plaintiff, Defendants and each of them, entered into a fiduciary relationship
with the minor Plaintiffs.

86. Defendants and each of them breached their fiduciary duty to Plaintiff by engaging in the
negligent and wrongful conduct described herein.

87. As a direct result of Defendant Priest's breach of his fiduciary duty, Plaintiff
suffered, and continue to suffer great pain of mind and body, shock, emotional distress,
physical manifestations of emotional distress, embarrassment, loss of self-esteem,
disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to
be prevented from performing their daily activities and obtaining the full enjoyment of
life; has sustained loss of earnings and earning capacity; and/or has incurred and will

continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT VIII
## FIDUCIARY FRAUD AND CONSPIRACY
## TO COMMIT FIDUCIARY FRAUD

88. Plaintiff incorporate all paragraphs of this Complaint as if fully set forth herein.

89. By holding himself out as a qualified Roman Catholic priest, religious instructor and counselor, and by undertaking the religious instruction and spiritual and emotional counseling of Plaintiff, Defendants and each of them entered into a fiduciary relationship with the minor Plaintiffs.

90. By holding themselves as the shepherd and leader of the Roman Catholic Church for the United States, Defendants NCCB and Defendant Dinardo enter into a fiduciary relationship with the Plaintiff and parishioners with in the United States.

91. By holding themselves as shepherd and leader of the Roman Catholic Church for Boston Massachusetts, Defendant Archdiocese and Defendant O'Malley entered into a fiduciary relationship with the Plaintiff and parishioners with in the Archdiocese of Boston.

92. As a fiduciary to Plaintiff, Defendant Archdiocese, Defendant NCCB, Defendant Dinardo and Defendant O'Malley had the duty to obtain and disclose information relating to sexual misconduct of Defendant Priest.

93. Defendants misrepresented, concealed or failed to disclose information relating to sexual misconduct of Defendant Priest.

94. Defendants knew that they misrepresented, concealed or failed to disclose information relating to sexual misconduct of Defendant Priest.

95. Plaintiff justifiably relied upon Defendants for information relating to sexual misconduct of Defendant Priest.

96. Upon information and belief, Defendants, in concert with each other and with the intent to conceal and defraud, conspired and came to a meeting of the minds whereby they would misrepresent, conceal or fail to disclose information relating to the sexual misconduct of Defendant Priest. By so concealing, Defendants committed at least one act in furtherance of the conspiracy.

97. As a direct result of Defendant Archdiocese's and Defendant O'Malley's fraud and conspiracy, Plaintiff suffered, and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT IX
## FRAUD AND CONSPIRACY TO COMMIT FRAUD

98. Plaintiff incorporate all paragraphs of this Complaint as if fully set forth herein.

99. Defendant Archdiocese and Defendant O'Malley knew of the sexual misconduct of Defendant Priest.

100.   Defendants misrepresented, concealed or failed to disclose information relating to sexual misconduct of Defendant Priest as described herein.

101.   Defendants knew that they misrepresented, concealed or failed to disclose information relating to sexual misconduct of Defendant Priest.

102.    Upon information and belief, Defendants, in concert with each other and with the
intent to conceal and defraud, conspired and came to a meeting of the minds whereby
they would misrepresent, conceal or fail to disclose information relating to the sexual
misconduct of Defendant Priest.

103.    By so concealing, Defendants committed at least one act in furtherance of the
conspiracy.

104.    As a direct result of Defendant Archdiocese's and Defendant O'Malley's fraud
and conspiracy, Plaintiff suffered, and continue to suffer great pain of mind and body,
shock, emotional distress, physical manifestations of emotional distress, embarrassment,
loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented
and will continue to be prevented from performing their daily activities and obtaining the
full enjoyment of life; has sustained loss of earnings and earning capacity; and/or has
incurred and will continue to incur expenses for medical and psychological treatment,
therapy, and counseling.

## COUNT X
## VICARIOUS LIABILITY
## (RESPONDEAT SUPERIOR)

105.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

106.    For the purpose of furthering his assignment duties Priest, Associate Pastor,
counselor and Pastor Defendant Priest identified Plaintiff as a young male child he could
groom to be obedient and trusting. Defendant Priest then sought and gained the trust and
confidence of Plaintiff so that he would respect Defendant Priest's authority, guidance,
friendship and comply with his instruction.

27

107.     For the purpose of furthering his assigned duties as priest, and counselor and later Pastor Defendant Priest also sought and gained Plaintiff trust, friendship, admiration, and obedience. As a result, Plaintiff was conditioned to comply with Defendant Priest's direction and to look to him as an authority on matters spiritual, moral, ethical, temporal and sexual.

108.     Using the power, authority and trust of his position as vicar, priest, spiritual director, guidance counselor, confessor, vocational advisor and holy figure to Plaintiff, Defendant Priest enticed, induced, directed, and coerced Plaintiff to engage in Defendant Priest's sexual abuse of Plaintiff.

109.     Using the power, authority and trust of his position, Defendant Priest enticed, induced, directed and/or coerced Plaintiff to engage in acts of sexual abuse and Defendant Archdiocese of Boston, Defendant O'Malley, Defendant NCCB and Defendant Dinardo are therefore vicariously liable for the acts and omissions of their agent Defendant Priest.

110.     As a result of the above-described conduct, Plaintiff suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT X
## NEGLIGENT RETENTION AND/OR SUPERVISION

111.     Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

112.     Upon information and belief, Defendant Archdiocese, Defendant O'Malley, Defendant NCCB and Defendant Dinardo by and through their agents, servants and employees, knew or reasonably should have known of Defendant Priest's dangerous and exploitive propensities and/or that Defendant Priest was an unfit agent, and despite such knowledge, Defendant Archdiocese and Defendant O'Malley, Defendant NCCB and Defendant Dinardo negligently retained and/or failed to supervise Defendant Priest in the position of trust and authority as a Roman Catholic priest and spiritual counselor where he was able to commit the wrongful acts against the Plaintiff.  Defendants failed to provide reasonable supervision of Defendant Priest, failed to use reasonable care in investigating Defendant Priest and failed to provide adequate warning to Plaintiff and his family of Defendant Priest's dangerous propensities and unfitness.

113.     As a result of the above-described conduct, Plaintiff suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT XII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

114.      Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

115.      Defendants conduct was willful, extreme, outrageous and was intentional or done recklessly.

116.      As a result of Defendants conduct, Plaintiff experienced and continues to experience severe emotional distress resulting in bodily harm.

117.      As a result of the above-described conduct, Plaintiff suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

WHEREFORE, Plaintiff prays for damages, treble damages, injunctive relief, costs, interest, attorney's fees and such other relief as the court deems appropriate and just.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Matt M Dispensa
Pro-se
59 Sousa Blvd
Hudson, NH 03051
05-23-2019
603-809-6756